# EXHIBIT 6

MICHAEL J. CHILDS                                                6/4/2015

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ROBERT SALINAS,           )
                          )
    Plaintiff,            )
                          )
v.                        )  CIVIL ACTION NO.:
                          )  4:14-cv-3153
KROGER TEXAS, L.P.,       )
                          )
    Defendant.            )


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ORAL DEPOSITION OF
MICHAEL J. CHILDS
JUNE 4, 2015
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    ORAL DEPOSITION of MICHAEL J. CHILDS, produced
as a witness at the instance of the PLAINTIFF, and duly
sworn, was taken in the above-styled and numbered cause
on JUNE 4, 2015, from 10:02 a.m. to 4:59 p.m., before
Stephanie M. Harper, RPR, CSR in and for the State of
Texas, recorded by machine shorthand, at the offices of
COZEN O'CONNOR, P.C., 1221 McKinney Street, Suite 2900,
Houston, Texas, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto; that the deposition shall be read and
signed before any notary public.


                     JOB NO. 186050

MICHAEL J. CHILDS 6/4/2015

36 (Pages 141 to 144)

### 141

1  be filed.
2  Q. You mentioned a store steward?
3  A. Right.
4  Q. Who has that been at Store No. 10?
5  A. It was Margie Rogers. Margie Rogers, who just
6  retired recently. And then Mitch Anderson is still
7  there. He's also a steward.
8  Q. And the other individual you had mentioned --
9  not the store steward, but the --
10 A. Business agent?
11 Q. Business agent. Thank you.
12 A. That was Walter Bailey. He has also retired,
13 though. At the time -- at that time, it was Walter
14 Bailey. They've got a different business agent today.
15 It's Mario -- I can't think of his last name, but
16 Mario.
17 Q. When did Walter Bailey leave or retire?
18 A. Guessing, two years ago.
19 Q. Fair to say he was out there during the
20 2011/2012 time frame?
21 A. That would be correct.
22 Q. Going back to this grievance process, to your
23 knowledge, can an employee grieve of sexual harassment
24 in the workplace to their union?
25     MR. BARRON: Objection, foundation.

### 142

1  A. I don't know.
2  Q. (BY MR. CAYCEDO) To your knowledge, has an
3  employee at Kroger, associate or employee, ever filed a
4  grievance related to -- to you personally, to your
5  management or anything along those lines?
6     MR. BARRON: Objection; vague.
7  A. Say that again?
8  Q. (BY MR. CAYCEDO) Sure. Are you aware if
9  the -- an employee has ever filed a grievance through
10 the unit related to you, to your management?
11 A. Against the store or the store in general. I
12 don't know if it was directed towards me individually.
13 Q. All right.
14 A. Not to me, I don't believe it was addressed
15 to. It was addressed to the store --
16 Q. Okay.
17 A. -- I believe anyway.
18 Q. You're not aware of being sub- -- the subject
19 of any grievance since you've been at Store No. 10, are
20 you?
21 A. Me personally?
22 Q. Yes, sir.
23 A. I don't believe so.
24 Q. Walter -- I think you said it was Bailey, is
25 that correct?

### 143

1  A. Correct.
2  Q. Did Walter Bailey ever communicate to you any
3  concerns that Robert Salinas has brought to his
4  attention?
5  A. Hard to remember. I mean, I -- there might
6  have been a scheduling issue that Robert -- there was
7  some problem with the schedule. I'm sure. Might have,
8  but I can't recall specifically what they were.
9  Q. Okay. As you sit here today, do you ever
10 recall Walter telling you that Robert had complained or
11 filed a grievance of sexual harassment by David
12 Castillo?
13 A. No.
14 Q. Other than the scheduling issue, do you
15 remember Walter bringing to your attention any other
16 grievances or complaints that Robert had filed with the
17 union?
18 A. Not that I can recall right now.
19 Q. Let's talk about what happened on April 6th,
20 2012. As I understand it, both David Castillo and
21 Robert Salinas were working at the produce department
22 on that morning, is that correct?
23     MR. BARRON: Objection, foundation.
24 A. That's what I understand, but I'm not sure.
25 But that's what I've been told.

### 144

1  Q. (BY MR. CAYCEDO) Okay. Through your
2  investigation, have you done -- have you looked at the
3  work schedules for that particular morning to see who
4  was there on April 6th, 2012?
5  A. I don't know. I can't remember if I did.
6  Q. If the work schedule for that particular day
7  showed that both David Castillo and -- and Robert
8  Salinas were working in the morning of April 6th, 2012,
9  would you have any reason to disagree with that?
10 A. I would probably want to verify they did work
11 their schedule, but I would have no reason to disagree
12 with it, that's correct.
13 Q. Okay. When were you first made aware of the
14 incident between David Castillo and Robert Salinas, of
15 David holding the knife to Robert's throat?
16 A. I believe it was the next day, which was, I
17 guess, the 7th, next day.
18 Q. And how were you first made aware of that
19 incident?
20 A. Police officer arrived at my store and came
21 upstairs and brought it to my attention.
22 Q. Do you recall which officer that was?
23 A. I believe his name is Officer Delgado.
24 Q. Do you recall anything about that conversation
25 you had with Mr. Delgado?

145

1  A. Not specifically. I don't remember the
2  conversation. I know he brought it to my attention,
3  and I know I called Tony to come upstairs and discuss
4  it with me, too, because I had not heard anything about
5  it prior to that.
6  Q  What exactly was it that Officer Delgado
7  brought to your attention?
8  A. That -- I believe that Robert had filed a
9  report or something with them alleging, I guess, that
10 David Castillo had grabbed him around the throat and
11 put a knife to his throat.
12 Q  Have you ever seen the report that the
13 Rosenberg Police Department did for that incident?
14 A. No. I believe my attorney mentioned a little
15 bit of it to me. But I --
16 Q  And again --
17     MR. BARRON: Don't talk about that
18 Object attorney-client privilege
19 Q  (BY MR. CAYCEDO) -- I don't want to get into
20 discussions you've had with your attorney
21 A. Okay. Then outside of my attorney, no.
22 Q  Let me just hand you what was marked as
23 Exhibit 9  And I'll give you an opportunity to look
24 that over
25     MR CAYCEDO  Sorry, David  I didn't

146

1  bring any extra copies.
2     MR. BARRON: If it's something I need. I
3  can always go run and get it.
4     MR. CAYCEDO: Fair enough
5     MR. BARRON: Or I can peek over his
6  shoulder, either way.
7  Q. (BY MR. CAYCEDO) Okay. On Page 3 of 10, do
8  you see how the exhibit here is numbered towards the
9  top right-hand corner?
10 A. Got it.
11 Q. Page 3 of 10, if you go to that bottom full
12 paragraph there, under "Officer Investigation"; do you
13 see that?
14 A. I do.
15 Q. It states: "I traveled to Kroger and spoke
16 with manager Michael Childs (DOB:  7/25/51)"; is that
17 your date of birth?
18 A. That is correct.
19 Q. ..."who advised he could" -- "he could recall
20 an incident where Mr. Salinas accused an employee,
21 David Castillo...of harassing him while at work."
22     Do you recall having that conversation
23 with the investigating officer?
24 A. Honestly, I do not.
25 Q. And this document doesn't help refresh your

147

1  memory at all as to whether that conversation took
2  place?
3  A. No, it really does not.
4  Q  It says. "Mr Childs further explained
5  Mr Salinas alleged Mr Castillo had pinched him on the
6  buttocks."
7     Did I read that correctly?
8  A. Yes, you did.
9  Q  Okay  You still don't recall having that
10 conversation with the officer?
11 A. I really do not.
12 Q  It states  "Mr Childs could not explain how
13 and if Mr Castillo was disciplined, but could advised
14 the two were separated and not scheduled to work
15 together."
16     Did I read that correctly?
17 A. Yes, you did.
18 Q  And you don't recall having that conversation?
19 A. I wish I did, but I do not.
20 Q  And at some point in time, you stated that --
21 well, let me ask you this  What all do you recall
22 telling the officer when they arrived that morning?
23 A. And I don't remember the conversation, what we
24 really -- really had. I know I called Tony up there,
25 and he told us about the incident, but I don't remember

148

1  the conversation whatsoever, and I wish I did.
2  Q  Okay  Well, at some point, you called Tony?
3  A. Yes, I did. I remember that he came up there.
4  Q  You called him over the PA and --
5  A. I would assume, yes.
6  Q  -- he called you, and you said, "Why don't you
7  come up to the office here," something along those
8  lines?
9  A. Something along those lines.
10 Q  And what did Tony say when he arrived?
11 A. I don't remember that either, honestly. I
12 mean, I just don't remember that whole conversation
13 there. I do remember the police officer telling me not
14 to do anything at that time. I remember don't do my
15 own investigation, let them handle it. But I don't
16 remember what I told the officer or Tony told the
17 officer. I really don't. I think if anything, I was
18 surprised about the whole thing. You know, somebody
19 put a knife to somebody's throat, but I don't remember
20 what the discussion was. I honestly do not.
21 Q  Okay  Do you remember how long that
22 conversation took?
23 A. I'm guessing, but I'd guess, you know, ten
24 minutes. But I don't know. I'm guessing.
25 Q  All right  And you said you've seen the

### Page 153

1  to I guess the next thing that happened after you had
2  the discussion with Athar and Martha?
3      A. Yes, it did.
4      Q. Okay. So it looks like that discussion you
5  mentioned a moment ago happened on April 9th, is that
6  correct?
7      A. Yeah, that's correct.
8      Q. Okay. So what was the next thing that took
9  place after that discussion with --
10     A. Well, sometime that day --
11     Q. -- HR?
12     A. -- probably sometime the same day, I tried to
13 call the Rosenberg Police Department, which -- to find
14 out what they -- what they were going to do or
15 something to investigate the case. They gave me a case
16 number, and the detective who was assigned to the case.
17         I then was able to talk to Detective
18 Montford about the case, who asked me for the schedule
19 of three associates. He said he'd be in contact -- it
20 would be in contact with them for interviews. So that
21 would have been on the 9th.
22     Q. All right.
23     A. So a couple of days go by, and nothing's
24 happened. And I think several times I said I called
25 and left a -- Montford an update -- update. And I

### Page 154

1  think I left several messages, actually. I called
2  trying to say, "When are we going to do something?
3  When are we going to do something, because we need to
4  move on with this. What was going to happen?"
5         Finally -- you want me to move on?
6      Q. Well, let me ask: During those days, the 8th,
7  the 9th, the 10th, and the 11th, to your knowledge was
8  David Castillo still working in the produce department
9  on the -- was he scheduled to work those days?
10     A. Yes, but we made some adjustments to the
11 schedule and separated them, so they weren't working
12 together.
13     Q. Okay. But he was still on the premises?
14     A. He was still on the premises.
15     Q. Do you know if he was still on the premises
16 around the same time that Robert Salinas was?
17     A. To the best of my recollection, we -- we
18 separated them so they at least weren't working
19 together. So I don't believe that they were together,
20 but to my -- I don't believe they were.
21     Q. Okay. When you say they weren't working
22 together, do you mean in areas of the store or same
23 shifts?
24     A. Schedules.
25     Q. Schedules.

### Page 155

1      A. Time.
2      Q. Hours?
3      A. Right.
4      Q. But the work schedules for that particular
5  time frame would reflect whatever they were working?
6      A. I would -- the schedules, maybe not the
7  schedules. We might have changed the schedules. The
8  actual time sheets, I -- to the best of my
9  recollection, we made some adjustments at least to
10 David's schedule so he wasn't working to the time that
11 Robert was scheduled. Now, the schedules are made the
12 week before. So if we made those adjustments, they
13 might not be reflected on the actual schedule that was
14 written.
15     Q. Okay. Do you know if there would be any
16 document that would show when they were working, Robert
17 and David Castillo, between the dates of April 7th and
18 April 12th?
19     A. I mean, if they could go back that far on the
20 timecards and look, I guess you could see.
21     Q. Okay. So then you had a conversation with the
22 Detective Montford on April 12th, is that correct?
23     A. That is correct.
24     Q. And at that time, that's when he told you it
25 was okay to go ahead and start your investigation?

### Page 156

1      A. Right. He said he would be attending a
2  funeral or something out of town, and he would be in to
3  talk to Andres, but we could go ahead and begin our own
4  investigation.
5      Q. Okay. And what -- how did you -- what did you
6  do then?
7      A. Well then, I immediately started trying to
8  gather statements. And that's when I asked Robert to
9  get a statement. Either I asked him, or I had
10 Ms. Mendoza ask him to get a statement. I'm not sure
11 if we -- whether we both did or what. But I know I
12 asked him, and I think she followed up. Possibly both
13 did or one of us did ask him to get a written
14 statement. As well as with -- yeah, okay.
15     Q. Other than you and Miss --
16     A. Mendoza?
17     Q. -- Mendoza. Okay. Mendoza. Other than you
18 and Ms. Mendoza, anybody else at Kroger involved in
19 that investigation?
20         MR. BARRON: Objection, vague as to
21 "involved."
22     A. Yeah, what do you mean by "involved"? I mean,
23 I -- I -- you know.
24     Q. (BY MR CAYCEDO) You're good at picking up on
25 the objections.

### Page 165

1    can't really say that, because it would depend.
2        Q  (BY MR. CAYCEDO) If an employee, one of your
3    associates, came to a department manager and complained
4    of being grabbed on the rear end, and saying that it
5    was unwelcome or unwanted, do you believe that's
6    something your department manager should document?
7        A.  I think it should be investigated.
8        Q  And as part of that investigation, do you
9    believe there should be some documentation concerning
10   that complaint?
11       A.  I guess that would kind of depend.
12       Q  And I know you don't recall as you sit here
13   today, when you spoke to Tony, if you did -- I know you
14   said that you assume that you did -- Do you remember
15   having any conversations with him about what he may
16   have witnessed or observed before April 6th, 2012?
17       A.  I know when we were -- we had talked about
18   it -- especially -- I mean, when we talked about it,
19   whenever it was back in those days and all, I know he
20   witnessed some of the -- the -- the horseplay that was
21   going on back there, if you want to call it that, in
22   the back room, which was probably not appropriate.  But
23   of the other issues, the sexual harassment, he told me
24   he never witnessed any of that.
25       Q  Okay  You say "horseplay."  Who -- who came

### Page 166

1    up with that word?  I mean, is that something that you
2    identified it as being, as horseplay, or Tony just said
3    it was horseplay, or where did you first hear the
4    phrase that what happened between Robert Salinas and
5    David Castillo was, quote/unquote, horseplay?
6        A.  I don't know.  I don't know if it came from
7    me, came from Tony, I don't know.  I don't know.  I
8    can't answer that.
9        Q  Okay  Did you ever sit down and speak with
10   Robert about what was going on between he and David
11   Castillo after the incident?
12       A.  Actually, when we -- the first time we really
13   sat down and spoke about it was in the presence of
14   William Yelderman and Athar to the best of my -- when
15   we sat down.
16       Q  At some point in time, you had a conversation
17   or an interview with Robert with William Yelderman and
18   Athar?
19       A.  That's correct.
20       Q  Do you recall when that conversation took
21   place?
22       A.  I think it's on the timeline.  Oh, I've got it
23   right here.  Never mind.  It was on the 19th.
24       Q  Okay  And let me show you what was
25   previously, made as Exhibit No 14 to Tony Medina's

### Page 167

1    deposition.  Do you recognize that document?
2        A.  Yes.
3        Q  Have you ever seen that document before today?
4        A.  Yes.
5        Q  When was the last time you've seen this
6    document?
7        A.  About a week ago.
8        Q  Is this among the documents you reviewed?
9        A.  That is -- yes.
10              MR. BARRON:  Let him finish just for the
11   record.
12              MR. CAYCEDO:  That's all right.  It's
13   natural.
14              MR. BARRON:  You're doing really good,
15   though.
16       Q  (BY MR. CAYCEDO) Do you know whose
17   handwriting this is on Exhibit 14?
18       A.  I can guess.
19       Q  All right.
20       A.  It was not mine.
21       Q  Fair enough.
22           Do you have a -- what's your best guess, was
23   it William's or Athar's?
24       A.  I think it's Athar's.
25       Q  Okay.  Was there anyone else involved in that

### Page 168

1    meeting besides you, Athar, William, and Robert?
2        A.  To the best of my recollection, it was just
3    the four of us.
4        Q  All right.  Who was taking the lead in that
5    interview in terms of asking the questions?
6        A.  The best I can remember, it was William.
7        Q  Did each of you take a role in asking
8    questions of -- of Mr. Salinas during that meeting?
9        A.  I don't really recall.
10       Q  To your knowledge, did William have any notes
11   that he was referring to during the meeting, or was he
12   using any kind of scripted questions, or anything like
13   that that you recall?
14       A.  I don't recall.
15       Q  Did you personally take any notes during that
16   meeting?
17       A.  No, I did not.
18       Q  Do you know if William did?
19       A.  I don't know.
20       Q  Second, I guess -- or the first full
21   paragraph, there it says:  "I work hard with the guys.
22   They play around.  People call me gay"...
23           Do you remember Robert making that statement
24   during the interview?
25       A.  Vaguely.

### 181

1   him.
2       So the police officer walks in to talk to
3   him. They had a brief discussion. I wasn't in that
4   discussion. And then they left. And he told David to
5   meet him down at the police station.
6       Didn't know what was going on. A little
7   later, the police officer came back and told me that
8   David had admitted to it. I don't remember any of the
9   details of what he admitted to. I might have asked
10  him, I -- I just don't recall what he admitted to. If
11  he told me at all, I -- I don't recall.
12      After that, really don't know what
13  happened. I believe Robert told me some things, that
14  he might have been in jail or something, too. But most
15  of that came from that; it came from Robert telling me
16  what he knew about it.
17  Q. Okay. Any conversations you had with David
18  Castillo after that meeting where the police officer
19  showed up to the store?
20  A. I don't believe I ever talked to him since,
21  that I can recall.
22  Q. Do you have any idea as to Mr. Castillo's
23  whereabouts today, have you ever seen him around town
24  or...
25  A. No, I heard at one point from somewhere that

### 182

1   he was in Dallas. And somebody else said he's back in
2   the Rosenberg area, but I have no idea.
3   Q. He hasn't -- you haven't seen him or observed
4   him back out at the store since?
5   A. No, I have not.
6   Q. All right. You mentioned you were putting him
7   on suspension pending an investigation.
8   A. Or pending advisement.
9   Q. Pending advisement.
10      What -- what does that mean?
11  A. Probably advisement to see if we were going to
12  terminate him.
13  Q. All right. Now, is that a suspension without
14  pay?
15  A. Absolutely.
16  Q. All right. Your notes say in the chronology
17  here under April 12th, you said: "David placed on
18  vacation next week."
19  A. That was when we were keeping them separated
20  prior to the police officer or whatever. So it was
21  prior to that. It was just a way to keep them
22  separated.
23  Q. All right. So did you place him on vacation
24  to keep them separated, or did you put them on separate
25  shifts or -- I'm just trying to make sure I understand.

### 183

1   A. I think it was a little of both.
2   Q. All right. His payroll records, would those
3   reflect whether he was being paid during that period of
4   time, to your knowledge?
5   A. It probably would. You mean while he was on
6   vacation or not working or whatever?
7   Q. Yes.
8   A. He was only working a couple of days a week at
9   that time, anyway. So it wasn't -- he had some
10  problems with diabetes or something, so he was limited
11  on how much he would work.
12  Q. And as you sit here today, are you certain
13  that he was suspended without pay pending advisement?
14  A. The only thing I would say is if the vacation
15  went ahead and went through, he might have got paid
16  vacation. I cannot tell you for 100 percent sure where
17  the vacation fell, I mean. But after that point,
18  unless some of that vacation was still being paid, and
19  I'm not sure when it was processed, I cannot tell you
20  for sure. I don't -- that was not the intent to have
21  him paid, though.
22  Q. And do you remember when that conversation was
23  that you had with David Castillo?
24      MR. BARRON: When you say "that
25  conversation," which one are you talking about?

### 184

1   Q. (BY MR. CAYCEDO) The one where the officer
2   showed up and said that they were going to go down to
3   the station and --
4   A. That was on the 19th.
5   Q. On the 19th?
6       Did you have Mr. Castillo, I guess, fill
7   out a resignation form at that time?
8   A. Yes.
9   Q. I'm not going to hold you to an exact number,
10  and I'm sure you've had multiple conversations with
11  Robert since the incident; is that fair?
12  A. That's fair.
13  Q. Okay. Do you know roughly how many
14  conversations you had afterwards regarding the
15  incident, the April 12th, 2000- -- or excuse me, the
16  April 6th, 2012, incident?
17  A. Oh, it was a lot of them. I mean, Robert
18  would tell me a lot of times that he was -- he was
19  scared. He thought somebody might be driving by his
20  house, what should he do. I mean, it was -- I don't
21  want to say it was a daily thing. But it was quite
22  often for a while after that incident we would talk.
23  So I can't even begin to put a number on that.
24  Q. Fair enough.
25      Do you remember if at any point in time

209

1   Q. Okay. Advisement of what?
2   A. Advisement from human resources to terminate
3   him.
4   Q. Okay. Had -- to your knowledge, had Kroger
5   made the decision whether or not to terminate
6   Mr. Castillo at the point where he was put on
7   suspension pending advisability of discharge?
8   A. That was the plan. After we had the -- after
9   we had the conversations that day, it was decided that
10  we were going to terminate him -- yeah, to terminate
11  him.
12  Q. Okay. And the first step -- again, the first
13  step under Kroger policy to a termination is what?
14  A. To put him on suspension pending advisement
15  for termination.
16  Q. Okay.
17  A. And actually, you know, David asked me at that
18  time what it meant. I told him -- or asked me what was
19  going to happen. I said, "Well, I'm pretty sure you're
20  getting ready to be terminated."
21  Q. Okay.
22  A. And that's when he asked me if he could
23  resign.
24  Q. All right. Did you take any other actions
25  with respect to limiting Mr. Castillo's ability to come

210

1   back in the store?
2   A. Yeah, I told the police officer, "Put a
3   criminal trespass on him."
4   Q. What does that mean?
5   A. When they walked out, he cannot legally come
6   back in the store.
7   Q. Okay. And if he did, what -- what would
8   happen?
9   A. He could be arrested immediately.
10  Q. All right.
11  A. And I think I told Robert that, too, at the
12  time, too, because I know that was a concern. And I --
13  you know, we didn't want him in the store.
14  Q. To your knowledge, is there anything else you
15  could have done to keep Castillo out of the store,
16  other than the steps you took?
17  A. Not that I'm aware of.
18  Q. One last question: Have you observed anything
19  with respect to Robert Salinas writing during the
20  deposition today?
21  A. He's been taking some notes.
22  Q. Okay.
23      MR. BARRON: Pass the witness.
24      MR. CAYCEDO: Okay. Brief follow-up,
25  Mr. Childs.

211

1       THE WITNESS: Okay.
2           FURTHER EXAMINATION
3   BY MR. CAYCEDO:
4   Q. How many suspensions pending advisement have
5   you issued since you've been a store manager at Kroger?
6   A. I have no idea.
7   Q. Okay. When you issue a suspension pending
8   advisement, is that something you typically document?
9   A. Typically. I can't say always.
10  Q. Did you ever document David Castillo's
11  suspension pending advisement?
12  A. I might have put it in that timeline possibly.
13  I don't know. I'd have to see that again, if I put
14  that -- I actually wrote that in there or not.
15  Q. Sure. You can take a look at the timeline.
16      MR. BARRON: I believe it was 16.
17      MR. CAYCEDO: Somewhere around there,
18  yeah.
19  Q. (BY MR. CAYCEDO) There you go. There you go.
20  I'll hand you Exhibit 16. That's your chronology there
21  or timeline. I'll give you an opportunity to look that
22  over.
23  A. I told David he would be suspended --
24  suspended pending advisement for discharge. I also
25  gave him the option to resign, which he did. Yeah, I

212

1   did.
2   Q. Aside from making a note in chronology or
3   making a note, when you've done suspensions pending
4   advisement in the past, is there a form that you can
5   fill out within the world of Kroger?
6   A. I mean, you could actually put it on a CA. I
7   guess you could put it on a CA what you did. But
8   that's the only form I know of.
9   Q. Have you done that in the past, documented a
10  suspension pending advisement on a CA?
11  A. I can't recall.
12  Q. All right. You didn't do that here --
13  A. No, I did not.
14  Q. -- with David Castillo?
15  A. No.
16  Q. Okay. And you said that decision was made
17  to -- that in fact, that's what y'all were going to do,
18  was ultimately terminate Mr. Castillo, correct?
19  A. That is correct.
20  Q. And why didn't you just terminate
21  Mr. Castillo, rather than giving him the option to
22  resign?
23  A. Well, in Krogerland, we always give
24  somebody -- tell somebody they can be suspended.
25  That's the way we do it pending the advisement.

```
 1                MR. FRANCISCO CAYCEDO - 03:56
                  MR. JOSHUA ESTES - 00:05
 2                MR. DAVID L. BARRON - 00:04
                  MR. BROCK C. AKERS - 00:00
 3          I further certify that I am neither counsel
 4  for, related to, nor employed by any of the parties or
 5  attorneys in the action in which this proceeding was
 6  taken, and further that I am not financially or
 7  otherwise interested in the outcome of the action.
 8          GIVEN UNDER MY HAND AND SEAL OF OFFICE, on
 9  this, the 13TH day of JUNE, 2015.
10
11
12
13          _____
            STEPHANIE M. HARPER, CSR
14          Certification No.:  7433
            Expiration Date:  12-31-16
15
16
    U.S. Legal Support, Inc.
17  Firm Registration No. 122
    363 North Sam Houston Parkway East
18  Suite 1200
    Houston, Texas 77060
19  713/653-7100
20
21
22
23
24
25  JOB NO. 186050 [MICHAEL J. CHILDS]
```