# ORAL AND VIDEOTAPED DEPOSITION OF ROBERT SALINAS

Page 186

A. Yes.
Q. Before April 6th, 2012, you never went to Kroger H -- Kroger's HR department regarding David Castillo, right?
A. I went but I don't know exact time I went.
Q. You went to Kroger's HR department?
A. Yes. I don't know when.
Q. Who in Kroger's HR department did you go to prior to April 6th, 2012?
A. I went for the situation.
Q. Who did you talk to in HR?
A. It was a man there. I don't know his name.
Q. When did that happen?
A. That was a long time ago. That was when I went -- I went with my lawyer.
Q. You went with your lawyer?
A. You know when you -- you're talking about when -- when this happened?
Q. Well, listen very carefully to my question. My question was: Before April 6th, 2012 --
A. Before it happened?
Q. -- before it happened, did you make any complaints to Kroger's HR department about David Castillo?
A. Only to when this -- to -- to -- let's see.

Page 187

Until he did this incident with the knife and then -- and then I told them everything.
Q. After the knife incident?
A. After, uh-huh.
Q. Listen to my question. My question is: Before the knife incident, did you ever make a complaint to Kroger's HR department about David Castillo?
A. No, I didn't know nothing about them.
Q. Okay.
A. I didn't know what -- even know what that is.
Q. That's fair. I'm just trying to get an answer to my question.
A. I don't know what -- what they are.
Q. Okay.
A. I don't even know what they are.
Q. Before April 6th, 2012, do you recall giving anybody a statement in writing about David Castillo and him harassing you?
A. To who?
Q. To anybody. Before the knife incident, do you recall giving a statement in writing about David Castillo to anybody before the knife incident?
MR. CAYCEDO: Objection, asked and answered.
A. I don't remember. It was more talking to,

Page 188

discussing with Tony about the situation.
MR. BARRON: I'm going to object to that as nonresponsive.
Q. (By Mr. Barron) Okay. In your -- going back to Exhibit 2, and I'm just going to use the Bates numbers. So go back to -- so find Exhibit 2, which is the synopsis. Yeah. And if you look at the bottom in the middle, there's a number. That's what I'm going to use since that's how it's -- the pages are labeled.
A. What number are you on?
Q. Yeah, I'm on 38.
A. Okay.
Q. Yeah. Okay. And at the bottom of that page it talks about, the second week of September David Castillo snuck up on you and grabbed you by the testicles and squeezed them very hard and said, When are you going to give me some? And you said, Never. He let go and walked away, laughing.
Let's talk about that incident. Do you believe that he thought it was funny?
A. Yes, he did. He was laughing.
Q. Okay. Do you -- do you believe that David Castillo actually wanted to have sex with you?
A. Yes.
Q. Why do you believe that?

Page 189

A. Because he told me he raped guys in jail.
Q. Do you think it's possible that he was just a jerk and wanted to intimidate you or bully you in some way?
A. No, I -- I think it was more than -- than bullying. It was a lot more than that. He has his hands all over me.
Q. How many times in total did he touch you?
A. One, two, three. I know he grabbed me down there; he pinched me; he ran his hand up my ass crack.
Q. Okay.
A. And he would walk by me and -- he would walk by me and -- and he would -- he would bump into me, like touch my back, like rub my back, working, you see, and he would just rub up on me.
Q. Hold on, don't go too far. You've got a cable on you.
A. Like rub up to me. You know what I'm saying?
COURT REPORTER: Wait, wait.
A. I'm sorry.
Q. (By Mr. Barron) Yeah, you're going to get the cables.
A. I'm sorry.
Q. That's okay.
A. I'm sorry. But I mean, he would -- you

Page 190

understand what I'm saying?
Q. Yeah.
A. He would, like, bump into me like that.
Q. Like brush against you?
A. Yeah.
Q. Okay.
A. You understand?
Q. Yeah, yeah. Okay.
A. I'm sorry I got up because I was trying to show you.
Q. No, that's okay. You're fine.
A. I was trying to show you.
Q. Okay. So I want to make sure I understand all the times that he touched you. There -- in -- in your -- in your statement here you said that he grabbed you on the butt. Was that the first time? That's the first time I see in here --
A. Yes.
Q. -- that he touched you.
A. He -- he squeezed me real hard.
Q. Okay.
A. Like that, really hard.
Q. And you had -- you had pants on, right?
A. Yes.
Q. Okay. Where were you when he grabbed your butt?

Page 191

A. In the cooler.
Q. And -- and where was he?
A. He was in the cooler. He came behind me.
Q. Okay. Did you know he was there?
A. No, I didn't. I was bending over when he got me.
Q. Okay. So you were bending over?
A. That's when he got me.
Q. And he -- he grabbed your butt?
A. Real hard.
Q. How -- he pinched it hard?
A. Yes.
Q. Okay. Now, was it a pinch or a grab?
A. No, he grabbed me real hard.
Q. Like his full hand?
A. Yes.
Q. Okay. How long did he -- did he touch you?
A. He grabbed me like that, and he squeezed real hard. And I turned around like that, and I -- I went like this, Leave me alone.
Q. So would you say just maybe, like, a second?
A. I can't give a time frame.
Q. Well --
A. I don't know.

Page 192

Q. Your best recollection.
A. I don't know.
Q. I mean, he didn't sit there and hold you for 10 minutes, right?
A. No, of course not.
Q. Okay. So it was just more like a --
A. Yeah, a little --
Q. -- a touch and you brushed it away, or a squeeze and you brushed it away?
A. Yeah.
Q. Right?
A. And I pushed him away, yeah.
Q. Okay. And then he made the comments that you have written down here, right?
A. Yes.
Q. And then it looks like the second time you allege that he touched you, he snuck up on you and grabbed you by the testicles.
A. Yes.
Q. Tell me about -- tell me about exactly what happened there.
A. He stuck his hand down there and he squeezed them real hard. And I told Tony about it.
Q. Okay.
A. I told --

Page 193

Q. Hold on. Where were you when it happened?
A. Not in that cooler. I was in the prep room.
Q. Okay. And were you sitting down, were you standing up, were you --
A. I was standing up.
Q. Okay. And where was Mr. Castillo?
A. Huh?
Q. Did he approach you from the -- from the back, from the side? How did he get close to you?
A. He approached me -- he was coming -- I was -- I was working, I had my back like that, and he came around -- around me on the side.
Q. Okay.
A. And put his hand down there.
Q. Okay. So you had -- you had clothes on; you had pants on, right?
A. Uh-huh.
Q. Okay. You said he grabbed your testicles?
A. Real hard.
Q. Real hard?
A. Uh-huh.
Q. Did he grab you from behind or from the front?
A. From the front.
Q. Okay. So he just reached down and -- and squeezed?

ORAL AND VIDEOTAPED DEPOSITION OF
ROBERT SALINAS

Page 194

A. Uh-huh.
Q. Okay. How long did he -- did he squeeze? Just like a second?
A. I can't give you a time frame.
Q. Okay. But was it pretty quick?
A. No, he -- it was not quick. He grabbed there and he squeezed it real hard.
Q. Okay. Did you -- did you knock him back or anything?
A. Yeah. I went like that and I pushed him away, and he laughed. He thought it was funny.
Q. Okay. So that's two incidents of touching. And then I think you testified that there's a third, where he ran your -- his hand down your pants or something along those lines?
A. Yeah. Well, not inside my pants. On the outer. He ran his hand down my ass crack.
Q. Okay. Tell me about that incident.
A. I told him -- I told Tony about it.
Q. Okay. But I want you to tell me about it. What do you recall?
A. God. I told him to leave me alone after he did that. I told him to stay -- leave me alone.
Q. But what did he do first that caused you to say, Leave me alone?

Page 195

A. He didn't say nothing. He just came behind me and did that.
Q. Okay. Now, I want to be sure I understand exactly what he did. His hand touched what, just your butt?
A. No, it ran up my ass crack.
Q. Okay. Did -- did his hand ever go inside your pants?
A. No, not inside; outside.
Q. On the outside?
A. And he pulled me up.
Q. Okay.
A. Rubbed -- rubbed me up like that.
Q. So he rubbed his hand along your ass crack?
A. Yeah.
Q. Okay. Kind of like a wedgy or --
A. No. He got his little finger and he ran it through there.
Q. Like -- okay. I think I understand you.
A. God.
Q. All right. That's the only time that ever happened?
A. When he did that to me, he didn't do that no more. It was just that, he did that.
Q. Okay.

Page 196

MR. CAYCEDO: Are you at a stopping point or do you want to go on?
MR. BARRON: Yeah, if you'd like to take a break. We've been going about an hour.
THE VIDEOGRAPHER: We're going off the record, approximately 2:30 p.m.
(Brief recess.)
THE VIDEOGRAPHER: We're coming back on the record, approximately 2:41 p.m.
Q. (By Mr. Barron) Mr. Salinas, before we went off the record we were talking about the incidents where Mr. Castillo had touched you. Do you recall that?
A. Yes.
Q. Okay. So I think we've covered three: There was the touching on the butt; there was the grabbing your testicles; and then rubbing his hand between your butt cheeks.
A. Yes.
Q. Okay. Those are the only three times that Mr. Castillo ever touched you?
A. Yes, that's all I can remember at this time.
Q. Okay. And your testimony is that you reported all three of those incidents to the store --
A. Yes.
Q. -- management?

Page 197

A. Yes, I did.
Q. And your testimony is that they didn't do anything about it?
A. Yes, sir.
Q. And why didn't you report those incidents to someone other than the store if you weren't getting the response that you wanted?
A. I did.
Q. Okay. Who?
A. The union.
Q. The union?
A. I didn't know who else -- what else to do.
Q. Okay. And did you get the response that you wanted out of the union?
A. He told me that he was going to -- this is what he said: He was going to talk to Mr. Childs and he was going to take -- he said, Don't worry about it. I'll talk to Mr. Childs about it.
Q. All right. Do you know if he talked -- and you're talking about Walter now, right?
A. Yes.
Q. Do you know --
A. I don't know if he did or not. I talked to him on the sales floor, not like together. You know what I'm saying, like Childs and Walter. It wasn't like

Page 202

Q. Well, you actually drafted two of them, right?
A. Yes.
Q. The longer -- there was a longer one and then the shorter one, right?
A. Yes.
Q. Why didn't you draft something up before the knife incident?
A. I don't know how to write. I had no help.
Q. Well, but you did have help because you --
A. I didn't get --
Q. Hold on.
A. -- it until later.
Q. Hold on. Hold on. You had help from Debbie Williams in drafting Exhibit 4 and Exhibit 2, so you had someone who you could ask for help if -- if you needed it, right? Right?
A. They helped me afterwards, because I didn't -- Debbie -- I didn't discuss this until later. I was embarrassed and I was ashamed to talk even to my family members about this. It's embarrassing.
Q. Okay. So are you saying that the reason you didn't go ask for help before --
A. I'm embarrassed. I'm ashamed.
Q. Okay. I understand.
MR. CAYCEDO: Robert, take a second and

Page 203

listen to his question.
A. Oh, my God.
Q. (By Mr. Barron) If that's the reason, that's the reason. I just -- I want to know. My client has a right to know.
A. It's hard to -- to talk to them like that.
Q. Okay. All right. So your testimony is that you were -- before the knife incident you were embarrassed to go talk to your family and ask for help?
A. I feel ashamed. I feel less of a man.
Q. All right. All right. Let's talk about the incident in April. On April 6th Mr. Castillo put a knife to your throat, right?
A. What -- what page are you on?
Q. I'm not. I'm not on here. I'm just asking you what happened. So tell me what happened on April 6th, everything that you can remember. I want to start from the very beginning. What time did you come to work that day?
A. 4:00 to 12:00.
Q. Okay.
A. I believe 4:00 to 12:00.
Q. Okay. Did you -- did you come to work at 4:00?
A. I think it was 4:00 to 12:00, I believe I

Page 204

started.
Q. What time did -- what time did Mr. --
A. He came at 5:00.
Q. Okay. Let me make sure. For the record, I was asking what time Mr. Castillo came to work that day.
A. I came in at 4:00.
Q. Okay. And Mr. Castillo -- I'm sorry, yeah. Mr. Castillo came in at what time?
A. He came in at 5:00.
Q. All right. And what -- what were your job duties on April 6th? What were you doing?
A. Me?
Q. Yeah.
A. I came -- I was straightening up the back room for the load -- to unload the truck.
Q. So you got a truck that day?
A. We get a truck every day.
Q. Okay. And so your responsibilities were to unload that truck and break it down?
A. I break -- I break not the whole truck down but the majority -- most of it, like the -- the stuff that goes in the inside.
Q. Right.
A. And then you got stuff that goes in the outside cooler. I was breaking the inside stuff.

Page 205

That's what I do, break -- the majority of that.
Q. And what was Mr. Castillo's job responsibilities that day? Was he on the cutting fruit?
A. He was going to cut fruit.
Q. Okay. About what time did the knife incident occur on April 6th?
A. I'd say around 10:30 in the morning.
Q. What were you doing at 10:30 in the morning?
A. I was cutting fruit. I was cutting fruit -- not cutting fruit. I mean, I was cutting the -- the green like stuff, the green leaf and everything. And I had my buggy loaded up and I'm fixing to go out -- out the door.
Q. Okay. So let me slow -- slow you down. Exactly where were you in the produce back room?
A. When he grabbed me, you mean?
Q. Yeah, or right before. Where were you in the produce back room?
A. I was in the -- by the sink. I was by the sink. And he would walk -- when he came in, when he walked by, he was making fun of my hair.
Q. All right. What did he say about your hair?
A. That I need to do something with my hair, like put gel or something. He goes, it looks bad.
Q. Was there something different about your hair

Page 206

that day?
A. I don't know, maybe it'd stand up. I don't know.
Q. I'm just saying, were you wearing a hat or something? I mean, was there any reason --
A. Sometimes I do wear a hat, sometimes I don't.
Q. Okay.
A. But I try to keep it short.
Q. Okay. Like, for example, if I take off my hat after I've been wearing it for a while, my hair might look a little messy. So my question is -- and -- and I'm not saying that did or didn't happen. I'm just asking you, was there anything in particular --
A. He --
Q. -- about that -- your hair that day that he was commenting on?
A. I don't know. He said he didn't like it. He said I need some -- to do something with it. I don't know.
Q. Did your hair look the same that day as it looks every other day?
A. Pretty much.
Q. Had he said anything about your hair earlier that shift, or was that the first time?
A. That's the first time he ever said something

Page 207

like that about my hair.
Q. Had anybody else at Kroger said anything about your hair that day?
A. People say I'm losing my hair.
Q. Okay.
A. Yeah, like right here in front.
Q. All right.
A. That's about it.
Q. Is that -- is that the only thing -- only thing that you heard about your hair at Kroger?
A. Pretty much.
Q. Okay. On that same day, did anybody else tease you about your hair other than --
A. Oh, no.
Q. -- Mr. Castillo?
A. No, just him.
Q. All right. So -- so he made a comment about your hair. What happened next?
A. And I said -- I said, Don't worry about my hair, just don't worry about me. I said, Just don't worry about me. Leave -- leave me alone. Worry about your hair. Don't worry about my hair. My hair is fine.
Q. All right. What happened next?
A. It's like he was -- he was pacing, like he was mad. He was mad in the back room, like he was mad. And

Page 208

then Andres was there. He was working at the cut fruit section. And he was later working right there, right next to him.
Q. Next to who, Castillo?
A. Yeah. Andres was over here. Andres here and David right here.
Q. Okay. And -- and since the -- the transcript won't show where your fingers were placed, you have them about --
A. That --
Q. -- an inch apart.
A. That --
Q. In real -- in real feet --
A. I think --
Q. -- distance, how -- how far is that?
A. I don't know. But David was working right -- okay. I was working first over here by the door, I mean, by the sink, by the door.
Q. Yeah.
A. And farther, like you could put almost two pallets there, and then he was working at that first sink. David was working the first sink. And next to David was Andres.
Q. Okay. So Mr. Castillo was about two pallets away from you? Is that what you're saying, two pallets'

Page 209

distance?
A. The amount of space?
Q. Yeah.
A. Between there and there? Maybe three maybe, I don't know, a little bit more. Three and a half.
Q. All right.
A. But the distance, maybe, I'm not sure of the distance.
Q. And Andres, who is another Kroger produce department employee, was -- was working right next to Mr. Castillo?
A. Uh-huh.
Q. Okay. Then -- so what happened?
A. He -- when I was walking by him --
Q. Yeah.
A. -- he came behind me. He -- he came behind me.
Q. Okay. So you walked --
A. He put --
Q. Hold on. You walked towards Mr. --
A. Yeah --
Q. -- Castillo?
A. -- I was going -- yeah, I was going -- going outside.
Q. Okay.

Page 210

A. I was going outside.
Q. So you had to pass by him?
A. Yes.
Q. All right.
A. And he grabbed me and he started choking me, and he choke – was choking me, and he had the knife on me –
Q. Okay.
A. – like this.
Q. So he grabbed you –
A. He had me like this, and he had a knife against my throat and put pressure against it.
Q. Okay. Just for the record, you had your arms sort of wrapped around your shoulder and you – you're saying that he put – put the knife to your throat?
A. No, I had my hands right here where my arms are down.
Q. Okay.
A. He had his arm around my neck and he was choking me. And he got a knife and he had the knife pinned against my throat like this.
Q. Okay.
A. And I got this hand, pushed it away, and I went underneath it and I took off.
Q. Okay.

Page 211

A. And I couldn't talk after that.
Q. Was – how long did that event happen? Was it pretty quick or –
A. It wasn't –
Q. – or did you struggle?
A. – that quick, no.
Q. Well, did you struggle with him for a little while or –
A. I couldn't move because the knife was against my – the blade was against my throat. I couldn't struggle or move around. He had me real tight.
Q. Okay. Now, when you say he – so he – he had you with one arm around your – your neck; is that right?
A. Yes.
Q. And then he had – in his hand he had a knife that he put to your throat?
A. Yes.
Q. The arm that he had around your neck, did he have his arm around your neck or his hand to your neck? In other words –
A. No, his arm.
Q. Okay. Kind of like a choke hold?
A. Yes.
Q. Okay. Could you breathe?

Page 212

A. I could but it was hurting. It was hurting. He was hurting me.
Q. Okay. The knife that he put to your throat, how close did the knife get to your throat?
A. It was – it was on my neck.
Q. It was touching your neck?
A. Yes. I felt the blade on my neck.
Q. And this is the – about a four- to six-inch produce knife, is that what – like a trim knife?
A. Yes.
Q. You use it to trim the – the green vegetables?
A. I trim them, yeah. I trim them and put them on my rack.
Q. It's a different knife, for example, than that you would use for cutting fruit?
A. He used it to cut fruit, too.
Q. He did?
A. Uh-huh, same knife. But he had – we got other knives to cut fruit, but he was using that – he had that knife on him.
Q. All right. So after this happened, he put the knife to your throat, you pushed him away, what did you do next?
A. I ran out the doors, those – those – those

Page 213

doors.
Q. To the sales floor?
A. Yeah, I went out to the floor and took off.
Q. And then what did you do?
A. I couldn't talk. I was in a state of shock.
Q. So what did you do?
A. I tried to get some air, and then I got – I talked to Andres about it.
Q. Well, Andres is in the back room, right?
A. Yes. I came back later, not right there – right there and then.
Q. But I – I want a – I want a very – I want you to do your best to tell me step by step what you did. So you – you went – you went out the door onto the sales floor. So now you're out in front of customers, right?
A. Yes.
Q. You weren't crying or anything, were you?
A. No. I was in a state of shock. I couldn't speak at that moment.
Q. So you didn't – you didn't cry or have any visible display of emotion at that point, right?
A. I couldn't speak. I was in a state of shock.
MR. BARRON: I'm going to object to that as being nonresponsive.

Q. Anybody. Anybody.
A. Until the next day.
Q. The whole world?
A. No.
Q. That same day, on that day, April 6th, did you talk with -- about the knife incident with anybody in the world --
A. Yes.
Q. -- other than Andres?
A. Yes.
Q. Okay. Who?
A. Crystal.
Q. Okay. When did you talk to her?
A. I went home, and I went to her house.
Q. All right. That same night --
A. Yes.
Q. -- or afternoon, I should say?
A. Uh-huh.
Q. About what time?
A. Probably around 3:00 something. I'm not sure --
Q. All right.
A. -- exact time.
Q. Tell me what you discussed with her.
A. What -- the things he was doing to me, that I

needed to go to the police because Kroger management were not doing nothing for me. And I said -- and she goes, Why don't you go to managers? I said, Why? They're not going to believe me. They never believe anything I tell them. So why do I go tell them something and then they're not going to believe me. They're just going to laugh in my face like they did with other things. I said, I'm not going to go to them because they're not helping me in any way, in any form, in this situation. That's why I went to the police. Why I'm going to go to Mr. Childs so he can laugh in my face and tell me, That's not true. That's your say against his say. It's useless talking to him. He was not going to do anything for me.
Q. Okay.
A. I knew he wasn't.
Q. Now, are -- are you saying that those are the things you said --
A. How I felt --
Q. -- to Crystal?
A. -- inside my heart --
Q. Yeah.
A. -- because he's not going to do anything for me. He hasn't done anything for me since day one in the situation I've been dealing with David Castillo --

MR. BARRON: I'm going to --
A. -- so what makes you think he's going to help me in this situation?
MR. BARRON: I'm going to object to that as being nonresponsive.
Q. (By Mr. Barron) I understand that's how you feel, and I'm not -- I'm not arguing with you. But my question is: What did you tell Crystal?
A. What happened to me.
Q. Okay. And tell -- tell me again what you told -- I want to know everything you told Crystal that day.
A. That he had me in a choke hold and he was going to slice my throat. And he called me a little fuck.
Q. Okay. Are you say -- so when -- when he put you in the choke hold and put a knife --
A. He told me --
Q. -- to your throat --
A. -- in my -- in my ear. He said, I'm going to kill you, you little fuck.
Q. Okay. Did he say anything else to you?
A. That I recall, no.
Q. Did he do anything else to you that day?
A. After that day, after that happened?
Q. No, that day. I'm talking -- we're just on

April 6th now.
A. Huh?
Q. That same day, April 6th.
A. That same day?
Q. Yeah, I want to know --
A. After that --
Q. -- if he did --
A. -- after he did that to me, he didn't -- he didn't mess with me the rest of the day.
Q. Okay.
A. He never said he was sorry. He never said nothing to me.
Q. So you didn't have any other words with him that day?
A. No, we never talked the rest of the day.
Q. Okay. Now, you said you talked to Crystal on April 6th. Did you talk to anybody else on April 6th about the knife incident?
A. No, I just talked to Crystal.
Q. No one else in your family?
A. I think my son Robert Scott, if I remember.
Q. What did you tell Robert Scott?
A. What happened to me.
Q. What did he say?
A. That's horrible.

Page 266

A. No.
Q. Were you involved at all with the sentencing of Mr. Castillo? In other words, did you have to go to court or anything like that?
A. I was going. And then that other man was there, like that prosecutor guy, I don't know his name, but he told me that I don't have to be there. But I thought I did, so I went a few times. And David caught me on the -- what do you call it? Like when you walk in, before you go to those courts, you know when you walk in those doors, he caught me. He said that -- that I needed to drop the charges.
Q. He said that to you at the courthouse --
A. Yeah.
Q. -- in the building?
A. Uh-huh.
Q. What did you say?
A. He -- he says -- and I looked at him and I said, No, I'm not.
Q. Did you say anything else?
A. And he just walked off and I walked away. That's it.
Q. So you weren't afraid to talk to him, were you?
A. Well, he approached me. I didn't approach

Page 267

him.
Q. Yeah, but when he -- when he approached you, you didn't --
A. There --
Q. -- run away.
A. There was cops there. Where he did it, there was -- there was cops in that section when he did it.
Q. Yeah. I mean, it seems a pretty brave thing to do when this guy that threatened to kill you comes up to you and starts talking to you, and you -- you tell him, No, I'm not; that's a pretty brave thing to do, right?
A. Yeah, but there's police there. There's police right there. They're -- they're all over the place up there, right there. They got --
Q. Well --
A. They got security everywhere, and they're right there in that room. He wanted me to drop the charges. Why should I? I mean, if that happened to you, would you drop the charges?
Q. Let's talk about your medical treatment. Have you had any medical treatment because of your experience with Mr. Castillo at Kroger?
A. Yes.
Q. Okay. What medical treatment have you had?

Page 268

A. I'm going through therapy.
Q. Who is your therapist?
A. It's a lady. I don't know her name.
Q. You don't know the name of your therapist?
A. Huh-uh. And -- and then I got -- I got to see a psychiatrist. He's an older man.
Q. Do you know his name?
A. Huh-uh. He's a black man. I don't know his name.
Q. How many times have you seen a medical professional? I'm not -- I'm not going to call them psychiatrist or whatever because I'm not sure exactly what their titles are. But how many times have you seen a medical professional because of the events related to this lawsuit; in other words, Mr. Castillo?
A. You mean, like before this, or what are you talking about?
Q. After.
A. Oh, I don't know how many times. I've got to -- I've got to go regularly because I've got to get my medication.
Q. Okay. I'm going to get to medication in a minute. So I want to know how many times you've seen a medical professional for something that you think is related to this lawsuit.

Page 269

A. He talks to me every time. He asks me how I'm doing, the psychiatrist.
Q. Okay.
A. Every time I have to get my medicine refilled, I have to talk to him.
Q. How -- how regularly -- well, let's just go backwards. Sometimes it's easier to go backwards. When was the last time you went to the psychiatrist?
A. I go, like, every two or three months, every two or three months.
Q. Regularly?
A. Yes.
Q. And you're doing that today?
A. Yes. It's almost time to go again because I'm almost out of my pills.
Q. How long -- how long has that -- how long have you been seeing a psychiatrist every couple of months?
A. For a long time. I don't know how long. I don't know exact -- exact time.
Q. Okay. Can you ballpark? What's your best estimate for me? More than a year or less than a year?
A. I'm not a hundred percent sure. I don't know exact time. I don't.
Q. Was it before or after the knife incident involving Mr. Castillo?

Page 306

A. .22, pellet gun, BB gun.
Q. When you were younger?
A. Uh-huh, when I was a kid.
Q. How about as an adult, have you ever shot a gun as an adult?
A. I don't -- like right now, you mean?
Q. You know, over the age of, say, 20, have you ever shot a gun?
A. Uh-huh. I shot -- let me see. What have I shot? Oh, I shot a .30-30. It was -- it was my -- my dad's rifle, my mom and dad's rifle. They gave it to my brother. I shot a .30-30.
Q. Did -- did anything else happen when the -- when the husband came with the -- to talk to you, did anything else happen?
A. That was it. I never saw him again, never talked again. That was it. It was over.
Q. Did you continue to be friends with Sonya?
A. Yeah, but I didn't -- I didn't -- I told her, I said -- yeah, we didn't --
Q. You stopped -- you stopped going out with her?
A. I stopped talking to her.
Q. Okay. All right. Any other incidents that you can recall where someone has threatened you or you've been the victim of some sort of violence in your

Page 307

life?
A. No. That I can remember, no.
Q. Would you agree with me that you haven't lost any income or wages as a result of -- as a result of your allegations in this lawsuit?
A. Yeah, I've been working. I haven't lost any wages. I've been working all the way straight.
Q. Right. You haven't missed any -- you haven't missed any work because you were upset or depressed about -- about Mr. Castillo's actions, right?
A. We asked for a medical leave, a medical, but Kroger said, no, they're not giving that.
Q. I need to -- I need to know about that. Tell me when you asked for a medical leave.
A. I mean, like, time off. It was, like, time off when we first went to mediation.
Q. This is at -- at mediation?
A. Uh-huh. Kroger said, no, they're -- if I took time off, they're not going to pay me.
Q. All right. This is something that you asked Kroger to do in the mediation; is that -- is that right?
A. Yeah, me and my lawyer, my lawyer did.
Q. Okay.
A. We did it together.
Q. All right. Normally I wouldn't want to know

Page 308

anything that happened in mediation. Other than what you said in the mediation, have you ever asked Kroger outside the mediation for time off that you were not given?
A. After that? You mean after that?
Q. Yeah. Either after or before.
A. After that, I needed a vacation time.
Q. Okay.
A. Later on they gave me a vacation.
Q. You got your vacation?
A. Uh-huh.
Q. Okay. Have you ever gone to Kroger outside of the mediation -- I'm not asking about the mediation -- and said, I need some time off for medical leave, and -- and you were not given it?
A. Afterwards?
Q. Yeah.
A. After all that?
Q. Yes.
A. No.
Q. Okay. Sitting here today, can you recall any specific days where you were not able to work because you were depressed or because you were upset about what had happened with Mr. Castillo?
A. I was -- I still worked, but I was hurting

Page 309

inside and I would cry on the sales floor.
Q. Okay.
A. I was hurting real bad. I would cry on the sales floor real bad.
Q. Who saw you cry at the sales floor?
A. Marvin.
Q. Marvin?
A. In front of customers, yes.
Q. Who is Marvin?
A. Produce manager.
Q. He's the one that replaced Mr. Medina?
A. Yes.
Q. Anybody else see you cry?
A. Yeah, Mr. Childs seen me cry.
Q. Mr. Who?
A. Childs saw me cry.
Q. Who is Mr. Charles?
A. And, like, Mr. Childs -- Mr. Childs said that, like, when I feel bad or I'm upset or something, I feel -- he could -- I could come upstairs and -- and then I could rest, I could -- so I can straighten up, you know, because I was hurting inside.
Q. How many times have you had to go -- go upstairs and compose yourself because you were crying at Kroger?

Page 310

A. I don't remember.
Q. Just a couple of times, or more than that?
A. I don't know. I didn't do it all the time upstairs. I might have did it on the floor.
Q. Is there anybody who would have seen you, other than Mr. Marvin and Mr. Childs?
A. Crying?
Q. Crying, yeah.
A. Jason.
Q. Jason? Okay. Anybody else?
A. Ms. Mendoza, Mr. Childs.
Q. Sitting here today, we've covered wages -- lost work, lost wages; we've covered your being depressed. Is there any other damages or harm that you know of that you're seeking to recover for in this lawsuit that you haven't talked to me about?
MR. CAYCEDO: Object to the extent it calls for a legal conclusion.
Go ahead.
Q. (By Mr. Barron) All right. This is my only time to talk to you, so I just want to -- if there is -- if there is something else that you're claiming, I'd like to know about it now.
A. Pain and anguish. Pain in my head.
Q. Okay.

Page 311

A. I cry and hurt inside.
Q. Okay. Anything else?
A. I get sick, and my stomach hurts, and I can't sleep at night.
Q. Okay. Do you take any medication to help you sleep?
A. I don't have none.
Q. Okay. Do you take any medication for your stomach?
A. He have gave me some.
Q. Who?
A. The doctor.
Q. The doctor?
A. I don't know what kind of medicine, because my stomach was hurting a lot.
Q. So if we looked at your -- your -- your prescription records, we'd see that you got some sort of drugs for your stomach?
A. I think it was -- I kept throwing up. I kept throwing up. In the morning I would throw up a lot. I don't know what kind of medicine I was given.
Q. Okay. Is there anything else in your life that -- that you -- you think you can't do now that you could do before this incident involving Mr. Castillo?
A. That I can't do in my life?

Page 312

Q. Yeah.
A. What do you mean?
Q. I mean, you said you can't sleep, for example, you have trouble sleeping.
A. I do things differently.
Q. Okay. Like what?
A. Like when I go to the restroom at -- when I'm at Kroger, I like -- I go to the family one because I'm -- because what happened to me. And I don't like other -- to be around other men in the restroom. I want to be in my own deal. I don't trust anybody.
Q. All right. Anything else?
A. It changed my life.
Q. Okay. How has it changed your life?
A. I scare easy. I stay home a lot more. I don't -- I don't go anywhere. I just go to work and go home because I don't want nothing bad to happen to me or my family. I stay safe at home. I don't want to be anywhere where I know he's still in town. My mom's telling me that we should move away to a different town so we won't be in the same town that he lives in.
Q. Okay. All right. Anything else?
A. I don't know anything else.
Q. I want to go over some of the -- real quick, I want to go back to the complaints. I -- we've talked

Page 313

about your complaints to Tony Medina. We've talked about your complaints to Mr. Childs. I want to talk about your complaints to other co-managers in the store. You -- you testified that you made some complaints to Ms. Mendoza?
A. Yes.
Q. What exactly did you tell Ms. Mendoza?
A. The things that he was doing to me.
Q. No, I want to -- I -- that's -- I want to know exactly what you told Ms. Mendoza.
A. That he grabbed me.
Q. Okay. How many times did you talk to Ms. Mendoza?
A. A few times, quite a few times. I don't know exactly how many times.
Q. More than one?
A. Of course.
Q. Okay. More than five?
A. Possibly more than five, yes.
Q. Okay. What exactly did you tell her was going on with Mr. Castillo?
A. The things he was doing to me.
Q. All right. Sir, I want to -- I -- I want to know, to the best you can recall, what you told her about. Did you tell her about every single --

ORAL AND VIDEOTAPED DEPOSITION OF
ROBERT SALINAS

Page 314

A. I told her --
Q. -- incident involving --
A. -- that he was touching me.
Q. -- Mr. Castillo?
A. Yeah, that he touched me.
Q. Okay. I want to know what exactly you told her about Mr. Castillo touching you.
A. How he ran his hand on me and grabbed me down in the bottom. When I told her, she started laughing.
Q. Okay. So my -- my understanding of your testimony today was that there was three situations where he touched you.
A. Yeah, he grabbed me down there.
Q. Hold on. Did you tell Ms. Mendoza about all three incidents?
A. Yes.
Q. Did you go to her three times, or did you just go to her the one time and tell her about all three incidents?
A. No, it was three different times. It was different times.
Q. So on the three occasions that Mr. Castillo touched you, your testimony is you went to Ms. Mendoza about all three of those incidents?
A. And I went to Tony. I talked to Mr. Childs,

Page 315

too.
Q. Okay. So your testimony is you went to Mr. Childs, you went to Mr. --
A. Tony.
Q. -- Tony Medina and Ms. Mendoza --
A. And Ms. Gordana.
Q. -- and Ms. Gordana --
A. Yep.
Q. -- on all of the incidents involving Mr. Castillo?
A. Yes.
Q. And none of them did anything?
A. That's right.
Q. That's your testimony?
A. That's right.
Q. And none of them put anything in writing. That's your testimony?
A. I don't know if they put anything in writing, but I --
Q. Not --
A. I don't know about that, but I know they didn't do nothing for me.
Q. Nothing that you saw in writing, right?
A. They didn't do nothing for me, for my safety.
Q. Answer my question. They didn't put anything

Page 316

in writing that you saw, right? Do you recall them ever -- ever putting anything in writing?
A. When I would talk to them?
Q. Yes.
A. No.
Q. Did they ever ask you for a statement?
A. Yes, that's where I -- I gave them one. I gave them the envelope and they got mad at me.
Q. All right.
A. They said it was not done right.
Q. All right. And I believe you testified that after they said that your envelope wasn't done right, that's when you prepared the statement that was in Exhibit 2?
A. Yes. And then they tell me to -- they told me that I need to bring the other one back, and the envelope. They wanted that one back.
Q. Did you bring it back?
A. I don't know what I did with it. I throw it away in the trash.
Q. Okay. So is your testimony that the only time that you made a complaint to Kroger management was the time where you were asked to prepare Exhibit 2?
MR. CAYCEDO: Objection, misstates the evidence.

Page 317

A. I made more complaints, but I just haven't -- haven't written it down.
Q. (By Mr. Barron) Okay.
A. It's not my fault I don't know how to spell and write. I'm sorry.
Q. I'm not -- I'm not accusing you of anything.
A. How can I -- what do you want me to do?
Q. So your testimony is that you went to -- how many times would you say you went to Kroger management and complained about --
A. Several times.
Q. -- Mr. Castillo?
A. Tony even told me that -- to stop going up there.
Q. Well, hold on. You're -- you're saying that at least on three occasions you went to Tony Medina, Ms. Gordana, Ms. Mendoza --
A. More than -- more than three times to Tony.
Q. Hold on, hold on.
-- and Mr. Childs. That's four different people. Okay?
A. Uh-huh.
Q. You're saying that you went to four different people at least three times?
A. No, more than three times.

# ORAL AND VIDEOTAPED DEPOSITION OF ROBERT SALINAS

Page 318

Q. More than three times you went?
A. More.
Q. So you -- so that's -- that's already 12. So you're saying, what, 20 times?
A. I can't say how many times. I don't know. I can't be -- I don't know how many times I went.
Q. Okay.
A. Tony even told me to stop going upstairs.
Q. All right. So you're saying you -- you went --
A. I can't say. I don't know.
Q. Okay. But I'm trying to get a -- a good estimate of how many times you think you went to Kroger management.
A. I don't know.
Q. Okay. More than 20?
A. I can't remember. It's been so long.
MR. CAYCEDO: Can we take a quick break or do you want to --
MR. BARRON: Sure, yeah, let's take a quick break.
THE VIDEOGRAPHER: Going off the record, approximately 4:31 p.m.
(Brief recess.)
THE VIDEOGRAPHER: We're coming back on

Page 319

the record, approximately 4:43 p.m.
Q. (By Mr. Barron) Mr. Salinas, you understand we're back on the record?
A. Yes.
Q. Would you say that the circumstances involving Mr. Castillo were more upsetting to you or less upsetting to you than having a gun put to your head in that earlier robbery?
A. They were both upsetting.
Q. Okay.
A. They were both upsetting.
Q. So you can't say which one was more worse or better?
A. The gun.
Q. Okay. I want to direct your attention back to Exhibit 2. There's a few things in there I want to ask you about. This document right here (indicating). And you may or may not even need to look at it, but there's some things you said in here that I want to follow up on.
A. What page are you on?
Q. Salinas 39. If you look at the bottom there's -- there's the numbers.
And at the bottom of 39 you talk about, In January of 2012 David Castillo was very upset that

Page 320

management was aware of what he had been doing. I believe he was embarrassed and this prompted him to seek revenge. I would catch him glaring at me. I thought he would be fired or transferred but nothing happened. His anger grew intense, and I feared he would eventually rape or cause me another type of bodily harm. And then you talk about the events of April 6th.
Do you think that the events of April 6th, him putting a knife to your throat, was Castillo getting back at you or getting revenge against you for something?
A. Maybe he was mad because he -- he was mad because those -- when I report him about those incidents he was doing to me, and maybe that's the way he was going to get back to me and hurt me.
Q. So you felt like the -- the events on April 6th was more of a violent act against you, not a sexual act, right?
MR. CAYCEDO: Object as speculation.
A. A violent?
Q. (By Mr. Barron) Right. Putting a knife to your throat is a violent act.
A. Yes.
Q. Would you agree with me about that?
A. Yes.

Page 321

Q. Okay. And --
A. It was both.
Q. Okay. Hold on. In -- in your notes here, in your statement, you said that he was trying to get revenge against you because you had reported him earlier, right?
A. Yeah, for those things he was doing to me.
Q. Right. And -- and you feel like on April 6th what he did was because -- born out of anger against you, right?
MR. CAYCEDO: Object to the extent it calls for speculation.
Q. Is that -- was that your impression?
A. He wanted -- he wanted those things from me he couldn't get from me, that he wanted from me. And -- and that's why he -- he'd do -- he'd do that to me.
Q. Okay.
A. I can't give him that. I'm a man. I can't do that with him.
Q. Well, let me ask you this: Do you think he was joking around with you on April 6th, or do you think he was angry with you on April 6th?
A. Angry.
Q. Why do you say he was angry versus joking around?

A. It wasn't his fault.
Q. Okay. Now, did -- you -- you said in here that they forgot to do a background check.
A. Yeah.
Q. Do you know whether there was a background check done or not?
A. On him?
Q. Yeah, on Mr. Castillo.
A. When they hired him?
Q. Yes.
A. A hundred percent, no, I don't know that.
Q. Okay.
A. But I -- I don't know that for a fact.
Q. Okay. And just so I'm clear, what exactly did Mr. Childs say to you, again?
A. He said that he didn't -- when he hired him he wasn't -- he didn't know if they did a background check on him.
Q. Okay. They did -- he didn't know if they did a background check?
A. He didn't know.
Q. Okay. So -- so he didn't say, We forgot to do a background check?
A. No, he didn't say that.
Q. He didn't say that?

A. He didn't know if they did. I don't know if he was sure.
Q. Thank you.
A. I'm sorry.
Q. No, that's all right. I just -- I wanted to clarify that.
All right. Mr. Salinas, thank you for your time today. That's all the questions I have for you.

EXAMINATION

BY MR. CAYCEDO:

Q. Robert, I just want to follow up with just a few brief questions. I know you're ready to get out of here. But I have to ask you about that name calling by David Castillo. Do you remember what names Mr. Castillo called you?
A. Yes.
Q. What names did Mr. Castillo call you while y'all were both working at Kroger?
A. He called me a faggot.
Q. What other names did he call you?
A. Gay.
Q. And I know it may be difficult, but just tell me all the names that David Castillo called you while y'all were both working at Kroger.

A. He called me "princess" and "mija."
Q. Any other names that you recall David calling you while y'all worked at Kroger?
A. He called me a homosexual.
Q. Can you answer a few more questions?
A. Yes.
Q. Do you recall any other names that David Castillo called you while y'all were both working at Kroger?
A. I can't hear you.
Q. Do you need to take a break?
A. Just tell me.
Q. Do you recall what other names David called you while y'all were both working at Kroger? Any other names you can remember?
A. He said I was a little girl.
Q. Anything else you can remember, as you sit here today, that David called you while y'all worked at Kroger?
A. I can't remember.
Q. Okay. How did it make you feel when David called you those names?
A. Less of a man.
Q. How else did it make you feel when David called you those names?

A. I felt ashamed, I felt embarrassed, and hurt. It hurts when he calls me those names.
Q. Did you think it was funny?
A. No.
Q. Did you think it was just horseplay between you and him?
A. No, sir.
Q. Why do you think David was calling you those names?
MR. BARRON: Objection, calls for speculation.
A. There's something wrong with him.
Q. (By Mr. Caycedo) Why do you believe he was calling you those names?
MR. BARRON: Same objection.
A. Because he was making those sexual remarks because he wanted to be with me.
Q. (By Mr. Caycedo) And why do you say that?
A. Because he kept touching me. He touched me and grabbed me.
Q. When he touched you and grabbed you, how did that make you feel?
A. Very dirty.
Q. Did you think the touching was funny?
A. No.

Page 338

Q. Did you think the touching was just horseplay between you and he?
A. No. It's horrible. People laughed at me in the back room and made fun of me. They all thought it was funny.
Q. Who made fun of you?
A. All of them did. L.J. Jason. They heard about it. Tony. And I told Tony that, What are you going to do when it happens to you? He goes, It's not going to happen to me.
Q. You sat in David – you sat in Tony Medina's deposition yesterday. Do you remember that?
A. Yes.
Q. Did you ever hear him admit that you had made those complaints to him?
A. No.
Q. Do you believe Tony Medina is an honest person?
A. No.
Q. Why not?
A. Huh?
Q. Why not?
A. Because he didn't tell the truth.
Q. Why do you think he didn't tell the truth?
A. Because he didn't want to. Because he knows

Page 339

what happened back there.
Q. When you say "he didn't tell the truth," what – what exactly are you talking about?
A. He knows the things that happened to me in the back room. He knows all the things that happened to me in the back room. He just didn't want to do nothing about it.
Q. The things we've talked about here today?
A. Yes, sir. He knows exactly everything. And Jason told me that he didn't want to do nothing with the situation, because he said that he didn't want it to affect his promotion.
Q. Have you tried your best to answer your questions the best you can here today?
A. Yes. I know I'm not perfect, but I do the best I can.
MR. CAYCEDO: We'll reserve.
MR. BARRON: Okay. I just have a few. I'm sorry.

FURTHER EXAMINATION

BY MR. BARRON:
Q. You went – you told opposing counsel a number of names that – that Mr. Castillo called you. And I would just like to know your best recollection of how many times you were called those names. And I'm just

Page 340

going to – I wrote them all down and I'm going to walk through each one. And I understand that –
A. How many times he called me those?
Q. Yeah, just your best recollection. I'm going to walk through each one, and you just tell me.
How many times do you believe he called you "faggot"?
A. I don't know how many times. He called me quite a few times.
Q. Okay.
A. I don't know.
Q. If you had to estimate, what would you say?
A. It's hard to say because he did it regular – on a regular basis.
Q. Okay. Can you put a number on it at all?
A. I don't know. He just did this on a regular basis.
Q. Okay. What about "gay"?
A. He did that a lot.
Q. Okay. And you don't think it's possible to put a number on it?
A. No.
Q. Okay. How about "princess"?
A. A few times.
Q. How about "mija"?

Page 341

A. A few times.
Q. When you say "a few times," I just want to get an idea of what you think you mean by that. How – in – in your opinion, "a few" is how many?
A. I don't know. It's just...
Q. Like, less than five would be a few?
A. More than – more than five, I'd say. I'd say at least – at least 12.
Q. Okay. So when you say "a few," you think that means about 12?
A. A few is more like – to me?
Q. Yeah.
A. How I feel?
Q. Yeah.
A. A few, more than – more than five.
Q. Okay.
A. It was more than five.
Q. So somewhere between five and 12?
A. Yes.
Q. All right. "Homosexual," how many times do you recall him calling you that?
A. I don't know how many times. He called me a lot. I'm not like that.
Q. Okay.
A. I'm not like that.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ROBERT SALINAS )
)
VS. ) CIVIL ACTION NO.
) 4:14-CV
KROGER TEXAS, L.P. )

REPORTER'S CERTIFICATION TO THE
DEPOSITION OF ROBERT SALINAS
TAKEN ON JUNE 2, 2015

I, MYLINDA TUBBS FAIRCLOTH, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, ROBERT SALINAS was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness.

That the deposition transcript was made available on June 15, 2015 to the witness or to the attorney for the witness for examination, signature, and return to Elite Reporting Service, Inc., by July 15, 2015.

That the amount of time used by each party at the deposition is as follows:

Mr. Frank J. Caycedo - 0 hours, 5 minutes;
Mr. David L. Barron - 5 hours, 20 minutes;
Mr. Brock C. Akers - 0 hours, 0 minutes.

That pursuant to information given to the deposition officer at the time said testimony was taken,

the following includes all parties of record:

Mr. Frank J. Caycedo, Attorney for Plaintiff;

Mr. David L. Barron, Attorney for Defendant;

Mr. Brock C. Akers, Attorney for Defendant.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.

Further certification requirements will be certified to after they have occurred.

Sworn to by me this 12th day of June, 2015.

______________________________

MYLINDA TUBBS FAIRCLOTH, CSR
Certification No. 2896
Expiration Date: 12-31-16

ELITE REPORTING SERVICE, INC.
Registration No. 75
5090 Richmond Avenue, #500
Houston, Texas 77056
(713) 623-4434
Fax (832) 518-2302

COURT REPORTER'S FURTHER CERTIFICATION

The original deposition transcript or Changes and Signature page ____ was or ✓ was not returned to the deposition officer. If returned, date received: N/A;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition transcription was delivered to Mr. David L. Barron for safekeeping on 7/22/15;

That a copy of this certificate was served on all parties shown herein.

Witness my hand this 21st day of July, 2015.

MYLINDA TUBBS FAIRCLOTH, CSR
Certification No. 2896
Expiration Date: 12-31-16

ELITE REPORTING SERVICE, INC.
Registration No. 75
5090 Richmond Avenue, #500
Houston, Texas 77056
(713) 623-4434
Fax (832) 518-2302